UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA

     v.                               File No. 2:21-mj-4

KARL DRESCH,

       Defendant.
_____/

Hearing
(Held over Zoom)
Before

THE HONORABLE MAARTEN VERMAAT
United States Magistrate Judge
January 22, 2021

<u>APPEARANCES</u>

For the Government:    Mr. Theodore Joseph Greeley
                         U.S. Attorney (Marquette)
                         Huntington Bank Building, 2nd Fl.
                         1930 US 41 W
                         Marquette, MI 49855
                         (906) 226-2500
                         Theodore.greeley@usdoj.gov

For the Defendant:     Ms. Elizabeth A. LaCosse
                         Federal Public Defender (Marquette)
                         925 W. Washington, Ste. 104
                         Marquette, MI 49855
                         (906) 226-3050
                         Beth_lacosse@fd.org

Courtroom Deputy:     C. Moore

Recorded By:         Digitally Recorded

Transcribed By:      Bonnie L. Rozema, CER-5571
                         (616) 878-9091
                         rozemab1@comcast.net

TABLE OF CONTENTS

<u>WITNESSES</u>:                                                    <u>PAGE</u>

None


<u>EXHIBITS</u>:

Govt. Exhibit 1 - Statement of Facts

Govt. Exhibit 2 - Photo of Atlanta Braves backpack

Govt. Exhibit 3 - Photo Atlanta Braves backpack

Govt. Exhibit 4 - Photo inside backpack

Govt. Exhibit 5 - Photo of ammunition

Govt. Exhibit 6 - Photo of rifle

Govt. Exhibit 7 - Photo of box of ammunition

Govt. Exhibit 8 - Photo of additional ammunition

Govt. Exhibit 9 - Photo of ammunition in drawer

Govt. Exhibit 10 - Photo of shotgun

Govt. Exhibit 11 - Photo of shotgun rounds

Govt. Exhibit 12 -

Govt. Exhibit 13 - Photo of Glock 40

Govt. Exhibit 14 - Photo of 150 rounds of ammunition

Govt. Exhibit 15 - Facebook posting from 11/19/20

Govt. Exhibit 16 - Facebook posting from 11/23/20

Govt. Exhibit 17 - Screenshot from video

Govt. Exhibit 18 - Message from 1/11/21

Govt. Exhibit 19 - Post response from 1/7/21

1    Grand Rapids, Michigan

2    Friday, January 22, 2021 - 1:01 p.m.

3                COURTROOM DEPUTY:  The Court calls the case

4        United States versus Karl Dresch, case number 2:21-mj-4.

5                THE COURT:  All right, good afternoon.  This is

6        U.S. Magistrate Judge Vermaat.  We're on the record in

7        Mr. Dresch's case.  Let me start by identifying who is

8        here.  I have Assistant U.S. Attorney Greeley representing

9        the United States, Assistant Federal Defender LaCosse is

10       representing Mr. Dresch.  Mr. Dresch is here as well.

11       Ms. LaCosse, do you and your client consent to have this

12       hearing by zoom?

13               MS. LACOSSE:  Yes, your Honor.

14               THE COURT:  Okay.  We also have Supervisory

15       Probation Officer Hekman here, my case manager, Ms. Moore,

16       and then there is a -- there's a public access line where

17       members of the public are able to listen in and there are

18       some people on there.  I have no idea how many people are

19       on there.

20               So this is the time set for detention hearing

21       for Mr. Dresch based on the government's motion.  That's

22       what we're going to do.  We have to talk about scheduling

23       and how things are going to go down the road in this case.

24               But Mr. Dresch, you do have a right not to make

25       a statement.  Do you understand that?

1          MR. DRESCH:  Yes, your Honor.

2          THE COURT:  Okay, and I also need to tell you

3    that anything you say here can be used against you.  Do you

4    understand that?

5          MR. DRESCH:  Yes, your Honor.

6          THE COURT:  All right.  Now I don't know how

7    this is going to -- how this detention hearing is going to

8    unfold.  That's up to the parties.  I may end up asking you

9    some questions as we go along here or the lawyers might ask

10   you some questions.  In fact I'm going to start with the

11   waiver form here in just a second.  But before I do that

12   I'm going to ask Ms. Moore to put you under oath.

13         Ms. Moore?

14         COURTROOM DEPUTY:  Raise your right hand,

15   please.

16         Do you swear or affirm that the testimony you

17   are about to give in this matter before the Court will be

18   the truth, the whole truth, and nothing but the truth?

19         MR. DRESCH:  Yes.

20              KARL DRESCH,

21         sworn by the courtroom deputy at 1:02 p.m.,

22   testified upon his oath as follows.

23         COURTROOM DEPUTY:  Thank you.

24         THE COURT:  Mr. Dresch, the other day when we

25   talked you seemed completely fine and being clearly and

-4-

1    able to proceed, but I do need to ask you just a couple
2    questions.  Have you taken any drugs or alcohol or
3    medications in the past 24 hours that would affect your
4    ability to understand what's going on here today?
5         MR. DRESCH:  No, your Honor.
6         THE COURT:  Okay.  And are you suffering from
7    any physical or mental impairments, illnesses,
8    disabilities, anything along those lines that would affect
9    your ability to understand what's going on here today?
10         MR. DRESCH:  No, your Honor.
11         THE COURT:  You feel like you're thinking
12    clearly?
13         MR. DRESCH:  Yes, your Honor.
14         THE COURT:  Yeah, you seem fine to me.  You do
15    have a right to have a lawyer represent you during this
16    hearing, detention hearing.  You asked for the Court to
17    appoint an attorney for you.  That's how I appointed
18    Ms. LaCosse to represent you.  You still have the right to
19    hire or retain a lawyer if you wanted to do that.  Do you
20    understand that?
21         MR. DRESCH:  Yes, your Honor.
22         THE COURT:  Okay.  During the initial appearance
23    a few days ago I mentioned that I had not received the
24    warrant.  I have received it now.  I don't know if you have
25    a copy of it or Ms. LaCosse has, but I have received a copy

1    of the warrant from the government, so I just wanted to

2    mention that.

3              Earlier today Ms. LaCosse filed a waiver of

4    Rule 5 and 5.1 hearings.  This waiver is ECF number 9 --

5    ECF, Mr. Dresch, stands for electronic court filings, so

6    it's just kind of our code for how we identify documents.

7    It bears the signature of what appears to be Ms. LaCosse

8    and Mr. Dresch and it's dated -- okay, I'm going to -- I'm

9    going to try to hold this up to the camera here and see if

10   you can identify that, the document here, Mr. Dresch.  You

11   probably can't.

12             MS. LACOSSE:  No, it's totally --

13             (Everyone talking at once.  Indistinguishable.)

14             THE COURT:  All right, no problem.

15             MS. LACOSSE:  Because of your background, your

16   Honor, he -- it sucks it up.  He might be able to see it

17   from mine.

18             THE COURT:  Mr. Dresch --

19             MR. DRESCH:  Yes, your Honor.  I see, your

20   Honor.

21             THE COURT:  Okay.  So here you're agreeing to

22   waive an identity hearing, production of the warrant, and

23   any preliminary or detention hearing to which you may be

24   entitled in this district, and you're requesting that those

25   hearings be held in the prosecuting district at a time set

1    for the -- by the Court.  You're also consenting to the

2    issuance of an order requiring your appearance in the

3    prosecuting district where the charges are pending against

4    you.  So some people argue about the language in that

5    particular provision.

6         Ms. LaCosse, it's your view that we're still

7    having a detention hearing here today, correct?

8         MS. LACOSSE:  It's my view, your Honor, that

9    you, in order to issue that order, would probably have to

10   waive the safety of the community and any other persons and

11   assure that he would obviously appear when he was told.

12        THE COURT:  Okay.  All right, well so, you know,

13   based on that, we're just going to have a detention

14   hearing.  That's what we were planning on doing and that's

15   what we'll go ahead and do.

16        Let me just talk a little bit about what a

17   detention hearing is, Mr. Dresch.  I'll kind of go through

18   what the rules are that we'll -- that we'll use.  So

19   basically it's a hearing where the government has the

20   burden in this case and they have to convince the Court

21   that you should be detained for the purpose of your

22   transfer over to Washington, D.C. where the case is

23   pending.

24        There are a number of different rules that

25   apply.  You have a right to be represented by counsel, as I

1      mentioned to you earlier.  You can testify.  You can

2      present evidence.  If the government puts on witnesses, you

3      can cross-examine those.  And you and your attorney can

4      proffer, which means that's an offer of proof, kind of a

5      legal -- the lawyers use that term.  It means here's what

6      I'm showing -- what I'm saying I could prove if I had more

7      time.  The government can do that as well.  The rules of

8      evidence don't apply.  If you watch TV shows involving

9      trials, you sometimes hear people making objections and

10     talking about hearsay.  The rules -- those are all

11     references to the Rules of Evidence which don't apply here.

12          So the question I have to consider though is

13     whether there's a condition or combination of conditions

14     that would reasonably assure your appearance, Mr. Dresch,

15     at your next hearing, as well as the safety of any other

16     persons in the community.

17          Now there are standards of evidence that have to

18     be met for me to detain you.  I would have to find by a

19     preponderance of the evidence that there was no set of

20     conditions that would reasonably assure your appearance, so

21     preponderance of the evidence standard applies to the

22     appearance question, and I would have to find by clear and

23     convincing evidence that no set of conditions would assure

24     the safety of other persons in the community.  So that,

25     it's a different standard.  It's the clear and convincing

1    evidence standard applies to whether there's a danger to

2    the community.

3              There is no -- there's no rebuttable

4    presumption.  In some cases there's a rebuttable

5    presumption for detention and we don't have that here.  But

6    here are the factors I'm going to consider:  The nature and

7    circumstances of the offenses charged; the weight of the

8    government's evidence -- now that's as to dangerousness

9    only.  I don't look at the government's case and go,

10   "That's a real strong case.  I'm going to detain

11   Mr. Dresch."  I can't do that.  What I can do is I can look

12   at their evidence and say, "What does that -- how does that

13   reflect on more dangers if he's released into the

14   community."

15             I look at your history and characteristics and I

16   have a pretrial services report that goes through your

17   history and characteristics.  I look at the nature and

18   seriousness and the danger to the community if you were

19   released.  Those are -- those are the things I'm going to

20   consider.

21             I'm going to tell you one other thing.  I'll

22   just tell both of the parties just a little bit.  You

23   obviously are -- you have to make your arguments that

24   you're going to make arguments off of evidence.  According

25   to the factors I'm going to -- but here are the things I'm

1     thinking about and I'll just preview this.  U.S. Probation

2     at this point, based on what they know, is recommending

3     Mr. Dresch be released on a set of conditions.  Those

4     conditions include a $20,000 bond.  He doesn't have to post

5     the $20,000 bond.  It's a non-secured bond.  They are also

6     recommending location monitoring so he could only -- he

7     could only go to his house and then out for specific things

8     like employment, doctor's appointments, that type of thing,

9     very closely monitored.

10     So for the government I would say you'd have to

11     overcome -- you'd have to prove that that's not going to be

12     sufficient.  And then for Ms. LaCosse, I would just say

13     when you look at Mr. Dresch's history, you've got a felony

14     in there, fleeing and eluding, high speed car chase, and

15     then of course there's the nature and circumstances of this

16     offense which we're all familiar with the events of January

17     6.  So I think -- I think it's a relatively close call here

18     and I have -- I mean there are things that have to be

19     figured out from both sides here.  So that's kind of a

20     preview of how I'm looking at things.

21     Mr. Greeley, you have the burden and you may

22     proceed.

23     MR. GREELEY:  Thank you, your Honor.  I intend

24     to first proffer information and then --

25     THE COURT:  Okay.

1          MR. GREELEY:  -- after we've gone through the

2     evidence, depending on whether Ms. LaCosse also wants to

3     proffer, to have argument.

4          (At 1:09 p.m., Government Exhibits 1 - 19

5     introduced.)

6          I have provided the Court and Ms. LaCosse with

7     Government Exhibits 1 through 19 and I would just like to

8     make sure that those were received.

9          MS. LACOSSE:  I have received them.

10         MR. GREELEY:  Your Honor, did you receive those?

11         THE COURT:  No, I don't have any exhibits.

12         MR. GREELEY:  They were sent to the court -- go

13    ahead, Ms. Moore.

14         COURTROOM DEPUTY:  I will -- I will forward them

15    to you now, your Honor.

16         THE COURT:  Okay.  Can you share a screen and

17    show those to me or --

18         COURTROOM DEPUTY:  No, I'll be --

19         THE COURT:  I can look when they show up in my

20    inbox.

21         MS. LACOSSE:  Well, I think it would be fair to

22    say that the one exhibit is the complaint.

23         MR. GREELEY:  Do you see that, your Honor?

24         THE COURT:  I have, let's see.  I haven't

25    received anything yet.

1    MR. GREELEY:  Well, can you see, I shared my

2  screen with you.

3    THE COURT:  Oh, let me take a look at that.

4  Yep, all right.  I gotcha.  Yep.

5    MR. GREELEY:  So I would like to begin, your

6  Honor, by turning to the pretrial services report.  I know

7  the Court has reviewed that and --

8    THE COURT:  Yep.

9    MR. GREELEY:  -- opposing counsel has reviewed

10  it, but I do want to just highlight the 2008 disturbing the

11  peace violation.  I don't know any of the underlying facts.

12  It does appear to have been issued by a police department

13  and not associated with the court, but it is a $375 fines

14  and costs on that one followed by a 2011 fine out of the

15  Waukesha Police Department for obstructing an officer.  And

16  then most notable from the government's perspective would

17  be the 2013 events, one being in Wisconsin, one being in

18  Michigan, where Mr. Dresch was convicted for fleeing and

19  eluding police officers.  And based on the description in

20  the pretrial services report, he was observed speeding

21  about 72 miles an hour in a 55 mile per hour zone and then

22  he began to accelerate going up to 145 miles an hour once

23  the police got behind him and tried to have him pull over.

24  In that time he was swerving around other vehicles and

25  obviously at 145 miles an hour, that's pretty fast.  For

1       that he did get one misdemeanor conviction and one felony

2       conviction in the state of Wisconsin.

3                Turning to the events that sort of lead us here

4       today.

5                THE COURT:  Hold on just -- hold on just a

6       second, Mr. Greeley.  So as I look at the pretrial services

7       report, bottom of page four, top of page five.

8                MR. GREELEY:  Yep.

9                THE COURT:  Well, there was a prosecution in

10      Iron County, Michigan and a prosecution in Florence County,

11      Wisconsin.

12               MR. GREELEY:  Right.

13               THE COURT:  That's where it looks like.  And it

14      looks like the Wisconsin conviction is a felony and then

15      there's two convictions in Michigan that are misdemeanors.

16      Is that how you read it?  All tied --

17              MR. GREELEY:  That's how I read it.

18              THE COURT:  Okay, that's all tied to the same

19      car chase.

20              MR. GREELEY:  It is, your Honor.  He -- I'm not

21      sure what the direction was.  I would presume that he went

22      from Wisconsin into Michigan based on --

23              THE COURT:  Yeah.

24              MR. GREELEY:  -- the convictions.

25              THE COURT:  Yep.

1       MR. GREELEY:  And he got -- he ended up with,

2  sorry, yes, he went from Wisconsin into Michigan.

3       THE COURT:  Yep.

4       MR. GREELEY:  And he did end up getting

5  convictions in both states.

6       THE COURT:  Yep.

7       MR. GREELEY:  So it is sort of a different

8  circumstance, but he was going quite fast and did end up

9  with a felony conviction for that.

10       Starting at Government Exhibit 1, and I don't

11  want to spend too much time on this, but that's a copy of

12  the statement of facts that is associated with the criminal

13  complaint in this case.  I know the Court is aware of the

14  events of January 6 and I know the Court has read through

15  this statement of facts and is aware of it.  But I'd like

16  to draw the Court's attention specifically to paragraph 24,

17  figure 6, as well as paragraph 29 in figure 7, which draw

18  sort of the attention to the fact that Mr. Dresch, taking a

19  picture of himself outside of the capitol wearing the same

20  clothes as the individual in figure 7, and then the cause

21  for FBI special agent to conclude that that is Mr. Dresch

22  in the capitol building on January 6th of 2021.

23       Now if you look at figure 7 you'll see that next

24  to Mr. Dresch and sitting against the bottom or sitting

25  against the pedestal of statue of John C. Calhoun is some

1      kind of a bag.  And if we move to Government Exhibit 2,

2      that's an enlarged image of figure 7.

3                    THE COURT:  Yep.

4                    MR. GREELEY:  You can see that that bag appears

5      to have an Atlanta Braves A, as well as you can't quite

6      read it, but it does look like Atlanta, and then there's

7      also a B-r-a, or an obscured B-r-a, consistent with the

8      Atlanta Braves.

9                    After the events of January 6, 2021,

10     investigators obtained a search warrant for Mr. Dresch's

11     Facebook account, also learned that he had likely traveled

12     to Georgia before returning to the Upper Peninsula Calumet

13     region, and they arrested him after they pulled him over,

14     knowing that he had a suspended license.  At that time

15     investigators obtained a search warrant for Mr. Dresch's

16     residence in case number 2:21-mj-2.  And inside

17     Mr. Dresch's house they found an Atlanta Braves backpack

18     that does appear to be, or is very strikingly similar to

19     the Atlanta Braves backpack that we see in Government

20     Exhibit 2.  Government Exhibit 3 is a picture of that

21     backpack.

22                    Inside the backpack, as we can see in Government

23     Exhibit 4 is a walkie-talkie of some kind, a D.C. Metro

24     card, a SmarTrip is what we see there, as well as several

25     boxes of 7.62x39mm rounds of ammunition.  Now in this

1    picture in Government Exhibit 4, you can see two of those,

2    each one contains 20 rounds of ammunition.  And if you go

3    to Government Exhibit 5, you will see that in total

4    investigators found eight boxes, each containing 20 rounds

5    of 7.62x39mm rounds of ammunition.

6          During the execution of that search warrant,

7    investigators found approximately 417 rounds of 7.62mm

8    ammunition, throughout the house, some in boxes, some

9    strewn, as well as, as we can see in Government Exhibit 6,

10    an SKS-type Russian-made 7.62x39mm rifle, along with a

11    bayonet that is not attached, but it's there in the bag

12    with the rifle.  That's Government Exhibit 6.

13          Government Exhibit 7 are pictures of ammunition

14    boxes for the 7.62x39mm rifle.  As you can see the box

15    there, full of ammo.  In Exhibit 8 you can see additional

16    7.62x39mm ammunition just laying out in the house.  And in

17    Exhibit 9 we see bullets in a table drawer.

18          In addition to the 7.62mm rifle, investigators

19    found a shotgun, as we can see in Government Exhibit 10, as

20    well as shotgun rounds, which we can see in Government

21    Exhibit 11.  During a subsequent search of Mr. Dresch's

22    house, investigators found yet another shotgun, as well as

23    a Glock 40, which we can see in Government Exhibit 13,

24    handgun with a bullet in the chamber and ten rounds in the

25    magazine.  In addition to that firearm, they also found

1  approximately, as we can -- some of which we can see in

2  Government Exhibit 14, 150 rounds of .40 caliber ammunition

3  for the Glock.

4          So we have a series of firearms found inside

5  Mr. Dresch's residence, as well as paperwork that shows or

6  ties Mr. Dresch to that residence.

7          As I mentioned earlier, there was a search

8  warrant for Mr. Dresch's Facebook account.  Some of those

9  posts may be relevant to the Court's determination here

10  today.  For instance, as the Court can see in Government

11  Exhibit 15, on November 19th, 2020, Mr. Dresch wrote, "When

12  the experts say don't stock up, stock up."  And among other

13  things he has a picture of a bunch of ammunition.

14          In Government Exhibit 16 you can see that

15  Mr. Dresch posted on November 23 of 2020 in response to a

16  political article about President Biden nominating Antony

17  Blinken as Secretary of State, Mr. Dresch wrote, "It's war

18  everywhere if we let this election get stolen."  It's

19  Government Exhibit 16.

20          Government Exhibit 17 is a picture of,

21  screenshot of some video where Mr. Dresch writes, "Okay,

22  all you conspiracy theorists, don't worry.  I loved you all

23  just setting the record straight.  Antifa did not take the

24  capitol.  That was Patriots.  I can't guarantee there

25  weren't some shit birds in the crowd, but what (noise

1    obstructing words) crowd can you guarantee.  Don't give

2    them the thunder.  We, the people, took back our house.

3    The news is all bullshit and now those traitors know who's

4    really in charge.  And I can't say I saw any violence from

5    our people, despite all the poking of the capitol police

6    gassing randomly and the women and children being peaceful.

7    Being old men, we kept it chill."

8                And if the Court refers back to Government

9    Exhibit 1 which is a copy of the statement of facts, the

10   capitol police officer confirmed that is within the capitol

11   building.

12               Moving to Government Exhibit 18, this is a

13   message that Mr. Dresch sent on January the 11th of 2021 in

14   which he said, "Bro, just keep alert.  You're going to be

15   bombarded with fake news, false hope, everything.  Trust

16   your eyes.  Watch a block.  The people are with us.  I'm on

17   tour but radio silence.  I'll hollar at you soon.  The

18   enemy is amongst us.  Ain't got the stomach for the

19   battle."

20               And finally in the Government Exhibit 19 in

21   response to the unknown post.  Mr. Dresch wrote, "Mike

22   Pence gave our country to the communists for its traitor

23   scum like the rest of them.  We have your back.  Give the

24   word and we will be back even stronger."  January 7th,

25   2021, the day after the storming of the capitol.

1    In addition, beyond the posts and whatnot, I
2    would like to make the Court aware that Mr. Dresch at this
3    time has refused COVID testing at the jail.  I think those
4    are basically the facts that I would like the Court to be
5    aware of in terms of a proffer, and I would intend to move
6    to argument, but I would like to give Ms. LaCosse an
7    opportunity to proffer, if that was her choice.
8        THE COURT:  Yeah, let's -- let's get through the
9    proffers and what we're going to call evidence, and then
10   I'll hear arguments from both sides.
11       Ms. LaCosse, you can take it from there.
12       MS. LACOSSE:  Thank you, your Honor.  So I'd
13   like to turn the Court's attention to the pretrial services
14   report and make that obviously part of the record.  I -- it
15   pretty much has been referenced and I just want to make
16   it --
17       THE COURT:  It is.  It will be included.  Thank
18   you.
19       MS. LACOSSE:  So the priors that Mr. Greeley
20   discussed are included in the reports, and even with those
21   priors, Pretrial Services has determined that there are a
22   set of conditions in which release would be safe.
23       First of all, a couple things about the priors.
24   One, as you can see, the last criminal prior was in 2013.
25   That's about seven years ago, your Honor.  There's been no

1    criminal activity or allegations in the last seven years.

2    As you can see from that report, he successfully completed

3    two full years of probation with no violations or any

4    problems following or complying with the court orders.  So

5    it's clear that after 2013 he was able to successfully

6    complete probation and he has been able to maintain a

7    lifestyle that does not include any criminal activity since

8    then.  As you --

9        THE COURT:  Let me ask you this, Ms. LaCosse.

10   If he's a convicted felon and he has ammunition and

11   firearms, isn't that criminal activity?

12       MS. LACOSSE:  Well, your Honor, I don't have any

13   information that, again, this is -- I'm just seeing these

14   pictures for the first time.

15       THE COURT:  Okay.

16       MS. LACOSSE:  I don't know who was in

17   Mr. Dresch's house prior to those being seized.  I don't

18   even know if that -- that I'm seeing the residence he's

19   living, but we know prior to this he was not in the area.

20   So from that aspect, your Honor, there are no criminal

21   convictions that we have here.

22       THE COURT:  Fair enough.

23       MS. LACOSSE:  And I think that's what we -- we

24   need to kind of focus on under these circumstances.  Also,

25   with all this information and there's, you know, pages and

1    pages and pages of information in the complaint, never once

2    is it alleged in that complaint that Mr. Dresch acted in a

3    violent manner.  There's no allegations that he broke

4    anything.  There's pictures of him.  He's not doing

5    anything disruptive besides taking pictures of himself in a

6    place that he was not supposed to be in.  So there -- and

7    it's clear from the pictures that Mr. Greeley showed,

8    there's no evidence that there was any firearms on

9    Mr. Dresch's person during this time period.  Obviously

10   there's a picture of a long gun and a rifle.  There's no

11   ability for him to have that without us be -- receive from

12   the pictures that have been presented to the Court here

13   today.

14           The other, a couple things I want to point out

15   about his history.  He's pretty much a lifelong resident of

16   the Upper Peninsula, although he did have a time period

17   when he lived in Georgia and met his wife.  He has family

18   that lives in the area, family that are willing to do

19   whatever the Court finds necessary to support him.

20   Unfortunately at this point, your Honor, his wife is out of

21   the area because her father just passed away and so she's

22   dealing with that issue in the middle of all of this also.

23           But his mother has been in contact.  She lived

24   in the Houghton area and is going to do whatever.  He has a

25   lot of support in the community.  He's a churchgoer and he

—21—

1    has -- his pastor has wrote a letter of support.  Everybody

2    indicates he's a nonviolent person.  He does have some

3    strong political views, but he's not a violent person, and

4    it doesn't appear, again, from any of these allegations

5    that there is any acts of violence in which the government

6    is alleging that he did on January 6, besides be in the

7    area in which he wasn't supposed to.

8              So but from that aspect, your Honor, let me just

9    make sure I'm hitting everything here with the paper.

10             Like I said, I spoke with his mother several

11   times.  She is willing to be either a third party custodian

12   if the Court felt that was necessary or willing to even put

13   her house up, she said.  And I explained that even though

14   there was a suggestion of a bond here, that that would be a

15   personal recognizance bond.

16             So if you look at what you're supposed to, the

17   weight here, can be sure that he'll reasonably appear, and

18   in this case I think there is adequate ability to show that

19   he will reasonably appear.  He's never not appeared for his

20   probation, he did what he was supposed to while he was on

21   probation under supervision, and I think he has the

22   wherewithal and the means to be able to get to Washington,

23   D.C. if he had to on his own, as well as we know

24   originally, as I've talked with the D.C. people that

25   initial appearances would be by Zoom or this type of a

1    situation in which there would not physically need for him

2    to be there.

3          Also, your Honor, I think it's worth mentioning

4    that the request by Pretrial Services include a tether, so

5    that type of a home detention electronic monitoring would

6    give the Court ability to be assured that Mr. Dresch is

7    where Mr. Dresch is supposed to be when he's supposed to be

8    there.  So we would immediately know if there was any

9    issues or problems with that aspect.

10         So under the circumstances, your Honor, I

11   believe that we can release him with a date and time to

12   appear in D.C. under the conditions as recommended by

13   Probation in a safe manner for himself and for the

14   community.

15         The other issue I think it's fair to point out

16   and I -- I think the Court should consider this.  Because

17   of COVID and because of the circumstances that we have, if

18   he's detained, it's going to take a lot of effort and a lot

19   of movement of him to get him to -- to court.  If he's

20   released, he can appear within three days and have all the

21   preliminary hearings and have all those things started and

22   that process started in the D.C. courts.  I believe under

23   this record, your Honor, that release with the requirements

24   by Probation is appropriate and would ask the Courts to

25   follow that and basically order my client to comply with

1    the Zoom request and appear in Washington, D.C., get his

2    attorney there, and start his defense in his case in the

3    proper jurisdiction.  Thank you.

4            THE COURT:  Thank you, Ms. LaCosse.

5            All right, Mr. Greeley, so Ms. LaCosse kind of

6    went into, you know, her argument as well there, but --

7            MS. LACOSSE:  Sorry.

8            THE COURT:  -- let me ask you -- that's okay.

9    That's okay.  So Mr. Greeley, I'll ask you a couple factual

10   questions.  If you want to put on more information in terms

11   of -- that's factual in nature, you may do so.  You could

12   also go into argument.  So you've got this, you've found

13   the Atlanta Braves bag, it's got the D.C. card in it, Metro

14   card in it, it has ammunition there and that's the 7.62

15   ammo that's in that bag, right?

16           MR. GREELEY:  Correct, your Honor.

17           THE COURT:  Okay, was there any sighting of a

18   long gun with -- I mean 7.62 is not handgun ammunition.

19   That's a long gun type of round.

20           MR. GREELEY:  The 7.6 -- the 7.62 39 ammo that

21   was found in that bag would be associated with a rifle, not

22   a handgun type.

23           THE COURT:  Okay.  Any indication that he had

24   one of those in D.C.?  It's not in any of the photos, I

25   don't think, right?

1             MR. GREELEY:  There is no indication at this

2     point that he did have that firearm in D.C. at this time.

3             THE COURT:  Okay.  And so the house in which

4     these materials, the SKS, the Glock, the .40 cal ammo and

5     the 7.62x39mm caliber ammo, how is that associated with

6     Mr. Dresch?

7             MR. GREELEY:  So that house is the house that

8     Mr. Dresch has on his driver's license.  In addition to

9     that, they found residency paperwork during both searches

10    of the house.  As Ms. LaCosse pointed out, Mr. Dresch's

11    wife is no longer in the area or is not currently in the

12    area, I should say.  The indication is is that Mr. Dresch

13    is the person who is living there currently.  And if the

14    Court wants to tie the gun, specifically the 7.62 rifle, to

15    Mr. Dresch, it would be curious for Mr. Dresch to have 7.62

16    ammunition in his bag, the Atlanta Braves bag that he has

17    inside the capitol, unless he also has an associated rifle

18    with it.

19             In addition to that, there is no one else found

20    in that residence at the time of the execution of the

21    search warrant.  There's no indication that anyone was

22    living there other than Mr. Dresch and possibly his wife,

23    Sarah Dresch.  And the Glock, the Glock 40, according to a

24    report from (noise obstructing words in recording) was

25    originally registered to Mr. Dresch's father who has passed

1    away.  So at this point there's no record of a transfer of

2    that firearm, and I think if I were to get into argument at

3    this point, the reasonable -- the reasonable inference

4    there is that Mr. Dresch inherited this Glock, the .40 cal,

5    from his father upon his father's death.

6              Now I have to disagree with Ms. LaCosse in terms

7    of a track record of not violating the law.  I don't know

8    how long Mr. Dresch has had these firearms, but the reality

9    of the matter is is he had a lot of ammo, he had over 400

10   rounds of the 7.62 ammunition, he had about 150 rounds of

11   the Glock 40 ammunition.  So to say that he has not been

12   violating the law is unreasonable to me when Mr. Dresch,

13   who is a felon, is in possession of ammunition and firearms

14   which, as the Court knows, is a violation of federal law.

15   It's also a violation of state law.  And it doesn't have to

16   be the firearm.  Just the ammunition itself is a violation,

17   as the Court knows as well.

18             So we have in that instance a disregard for the

19   law.  We also have a criminal record that shows that

20   Mr. Dresch in at least one instance disregarded the

21   police's direction to pull over, and instead sped up to a

22   speed that is in excess of anything that is safe on the

23   roads.  Beyond that we have prior potentially obstructive

24   behavior in the 2011 Waukesha incident, or I believe it was

25   Waukesha.  Let me confirm.  Yeah, the Waukesha incident

—26—

1    where there's some kind of obstructing a police officer.

2            We have an individual who currently is in the

3    jail living with other people who has decided that he

4    should disregard the requirements of being tested for

5    COVID.  That seems to be someone who's not really willing

6    to listen to best advice and willing to listen to the

7    recommendation of the people around him when he gets -- he

8    is living.

9            And this is all in the context of an individual

10   who has posted about going back to the capitol.  On January

11   7th, the day after these incidents occurred, as noted in

12   Government Exhibit 19, he said, "We will be back if someone

13   gives the word."  While I suspect the argument from

14   Ms. LaCosse would be it's just idle talk, but Mr. Dresch

15   had been talking about going to the capitol, as noted in

16   Government Exhibit 1, for some time.  And he acted on that.

17   He went to the capitol and he went on the capitol grounds,

18   in violation of the law, from the government's perspective.

19   And I understand that he has a right to a trial, but at

20   least on a probable cause basis, there's enough to say that

21   he did.  And he said he will go back.  And his track record

22   suggests to me, and I think it should suggest to the Court,

23   that he does not respect the law.  He does not respect the

24   requirements that are set upon him by society at large.

25            In viewing his history, in viewing what evidence

1    the Court has before it, I don't think there's any

2    combination of conditions that will reasonably assure the

3    safety of the community or assure his appearance.  Because

4    Mr. Dresch is at a minimum -- or is, based on this record,

5    unable to conform his conduct to the law.

6            THE COURT:  All right, thank you, Mr. Greeley.

7            Ms. LaCosse, do you want to respond to any of

8    those legal arguments?

9            MS. LACOSSE:  Yes.  I want to talk a little bit

10   about this COVID testing.  First of all, being in jail is

11   not a -- there's no requirement that you get COVID tested.

12   I mean they ask you to and if you don't then you're put in

13   isolation.  Mr. Dresch had some questions.  We're in a

14   unique situation where he doesn't have the ability to talk

15   to his lawyer by phone or those types of things.  I did

16   discuss it with him today about COVID testing.  It is my

17   understanding that I believe he told the jail that he would

18   go through and have the COVID testing, but he had some

19   questions about it that he needed to address and he

20   addressed those.  It wasn't an inappropriate question or

21   inappropriate issues, and I saw him shaking his head I

22   believe after we discussed it.  He told the jail that he

23   would get the COVID testing.

24           So the issue, you know, Mr. Greeley says, oh, he

25   might go back to D.C.  Well, if he has a tether on, we'll

—28—

1     know as soon as he walks ten feet out of the area he's

2     supposed to be in.  I don't think on this record there is

3     enough of an ability to believe that he would not follow

4     the Court's orders and rules, especially with the risk that

5     he has with the convictions over, you know, the potential

6     of criminal charges, more criminal charges based on the

7     bond order.

8           So I think the bond order that's request --

9     recommended is appropriate, will assure his appearance in

10    D.C. by video or physically when he needs to be.  And in

11    the meantime he can live at his house, obviously there

12    would be -- they took the guns and weapons, there's no

13    access, he has no access to any ammunition or guns,

14    weapons, anything along those lines, and he would be able

15    to be, you know, in -- work with his attorneys in D.C. on

16    the case and be able to assist in the care of his son.  He

17    has a child, a minor child here.  And deal with his family

18    all in a safe situation which is not going to put the

19    community at risk at all.  Thank you.

20          THE COURT:  All right, thank you, Ms. LaCosse.

21    Actually, I'm going to give Mr. Greeley, he gets the

22    last -- it's his motion, he has the burden, the last word

23    on anything.

24          MR. GREELEY:  I will just make one point, your

25    Honor.  Mr. Dresch never should have had guns in the first

```
1          place.
2                    THE COURT:  All right --
3                    MR. GREELEY:  No, go ahead.
4                    THE COURT:  No, go ahead.  Keep going.
5                    MR. GREELEY:  Well, and the fact of the matter
6          is the fact that he has them suggests that what this Court
7          says isn't going to have a lot of sway in terms of
8          firearms.  He could get them when they were illegal before,
9          there's no reason to think that he can't get them now when
10         it's just as illegal.
11                   THE COURT:  Okay.  Thank you, Mr. Greeley.
12                   All right, the Court is considering the
13         parameters and restrictions and limitations from the Bail
14         Reform Act and is considering all the factors set forth in
15         Section 3142(b).  And I'm also considering the proffers by
16         the lawyers as well as the arguments by the lawyers.  Both
17         lawyers made very effective arguments here today.  The
18         Court's considering all 19 of the exhibits put forth by
19         Assistant U.S. Attorney Greeley, as well as the pretrial
20         services report.  The (recording fades out).  As far as the
21         COVID point, that's not actually going to have a bearing on
22         (recording fades out) Mr. Dresch said that he would get a
23         COVID test.  That's not really (recording fades out).
24                   MR. GREELEY:  Your Honor, we're having a hard
25         time hearing you I think.
```

1           THE COURT:  Okay, somebody had something going

2    there.  Can you hear me now?

3           MS. LACOSSE:  Better.

4           THE COURT:  Okay.  You know what, Ms. LaCosse,

5    if you could mute, and I'm not going to ask Mr. Dresch to,

6    you just stay where you are there, Mr. Dresch.  And then if

7    it's just the two of us that have our audio on and

8    something -- if we pick up some problem there, we'll know

9    it's coming from one of those two things.

10          So one of the difficult things, Mr. Dresch, in

11    making one of these bond decisions is this calls for the

12    Court to look -- look into the future.  Is there a

13    preponderance of the evidence that you're going to be a

14    flight risk, is there clear and convincing evidence that

15    your release would pose a danger to the community.  Those

16    are the questions we consider.  That's different --

17    different from what usually happens in the law.  Normally

18    judges and juries are looking backwards to try to figure

19    out what happened.  They try to come to some agreement or

20    make some determination of what happened in the past, and

21    this is unique because we're trying to look -- look to the

22    future.

23          And so here there are some things that are

24    certainly concerning to the Court.  You know, when you have

25    a high speed chase, you know, with the police officers in

1    2013, you know, that's -- you know, you get a sentence -- a

2    sentence for that, but that has a potential to -- to come

3    back to haunt you down the road.

4         That incident is troubling to the Court because

5    you could just picture, you know, high speed chase, you

6    know, up to 145 miles an hour.  The police officer's behind

7    you, lights and sirens, the whole nine yards, and this was

8    not, it seems like, a very short thing.  It went from

9    Wisconsin into Michigan.  It was a long enough chase for

10   people to have radioed ahead.  So this wasn't just a quick

11   30 second high speed acceleration and traffic stop.  So

12   this is someone who is willfully ignoring directions from

13   police officers with lights and sirens on to pull over.

14   And creating a risk to the public.

15        He ends up getting a felony conviction and then

16   as we look to the current time it looks like he has

17   ammunition and firearms.  I mean I'm not saying beyond a --

18   beyond a reasonable doubt.  There may be some issues there

19   in terms of possession, you know, who possessed it, was

20   there somebody else who possessed it there, but as

21   Mr. Greeley pointed out, there was nobody else that they

22   could identify living in the house.  So you've got someone

23   with a felony conviction, the standard practice is to

24   inform people when they have felony convictions they can't

25   have firearms and ammunition, and you have Mr. Dresch who's

1       still doing that.  So that's -- that's a concern.

2              You've got the 2013 incident, admittedly seven

3       to eight years ago, but then there appears to be ongoing

4       criminal conduct, not a conviction as Ms. LaCosse points

5       out, but conduct that could be the basis for new charges,

6       as well as a conviction, and it deals with firearms, and

7       firearms are always a concern to the Court.

8              And then you look at the events relating to what

9       happened in Washington, D.C. on January 6.  You know,

10      Mr. Dresch doesn't have, I'm going to recognize a positive

11      thing.  There's nothing in the -- in the images he shot of

12      him doing anything violent.  There's nothing -- he's not

13      putting a flag pole through a window, he doesn't appear to

14      be climbing over barricades, there's nothing where he's

15      shown chasing a police officer.

16             But on the other hand, he's in that location,

17      he's got that Atlanta Braves bag which was later found to

18      have ammunition in it, maybe he put it in later but, you

19      know, it's found here in the U.P. with the D.C. Metro card

20      in it and some ammunition in it.  And then you've got the

21      posts, you know, Exhibit 18 he's talking about having the

22      stomach for battle.  And more problematic is the post in

23      Exhibit 19, which was the day after, the day after the

24      events in Washington, D.C. where Mr. Dresch is saying that

25      he's going to be back even stronger.  And those -- those

1     are concerning.

2           And, you know, so you have someone with a

3     history not following directions of law enforcement,

4     followed up with at least clear and convincing evidence of

5     possession of a firearm after a felony conviction,

6     statements made on January 7th after, this is after the

7     events in Washington, D.C., all of those lead the Court to

8     find that based on the totality of the circumstances here,

9     the nature and circumstances of the offense, the weight of

10     the government's evidence as to dangerousness, Mr. Dresch's

11     history and characteristics and the nature and seriousness

12     of the danger if he were released, that there is a

13     preponderance of the evidence that no set of conditions

14     will ensure his appearance.  There's also clear and

15     convincing evidence that no set of conditions would assure,

16     reasonably assure that he would not pose, his release would

17     not pose a danger to the community.

18           And I know that's -- that's a difficult thing.

19     I think it's a -- this was a close call.  It would have

20     been a close call without the information on the gun, the

21     gun and the ammunition, but the guns and the ammunition are

22     problematic for the Court when you mix those with the

23     statements Mr. Dresch was making at the time of the

24     incident in Washington and shortly thereafter.

25           And so that's going to be the Court's ruling

1   here.  I'm going to detain you, Mr. Dresch.  The marshals

2   will transport you.  I'm going to -- I'm going to ask them

3   to do that as quickly as possible but, you know, that's --

4   you're part of the system there and hopefully they can get

5   you there relatively quickly.  You will have the ability to

6   have a preliminary hearing and all the other hearings that

7   are available to you once you get there.

8              I will indicate that you're requesting counsel.

9   You could, of course, hire or retain a lawyer if you wanted

10  to do that, but that's going to be the Court's ruling.

11             Anything else from the government, Mr. Greeley?

12             MR. GREELEY:  No.  Thank you, your Honor.

13             THE COURT:  Anything else from the defense,

14  Ms. LaCosse?

15             MS. LACOSSE:  Sorry --

16             THE COURT:  You're --

17             MS. LACOSSE:  -- I couldn't get my -- I couldn't

18  get my cursor to work there.  No, your Honor.

19             THE COURT:  Okay.  That will be it, Mr. Dresch.

20  Good luck to you down the road.  All right, thank you.

21             MR. DRESCH:  Thank you, your Honor.

22             (At 1:45 p.m., proceedings concluded.)

23                          -oo0oo-

24

25

CERTIFICATE OF REPORTER


STATE OF MICHIGAN     )
                      )  ss.
COUNTY OF KENT        )


        I, Bonnie L. Rozema, CER, do hereby certify that this transcript, consisting of 36 pages, is a complete, true, and accurate transcript, to the best of my ability from the audio recordings over Zoom, of the proceedings and testimony held in this case on January 22, 2021.

        I do further certify that I prepared the foregoing transcript.


/s/  Bonnie L. Rozema

Bonnie L. Rozema, CER 5571
2700 92nd Street, S.W.
Byron Center, MI  49315
(616) 878-9091


Notary Public in and for
Kent County, Michigan
My commission expires:
March 26, 2025
Acting in the County of Kent